C. E. HARDY, Appellee, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

**Master and servant:** DUTY TO WARN AND INSTRUCT. The duty of a master to warn and instruct his employé arises when the existence of a danger is, or in the exercise of reasonable care should be known to him, and is either unknown, or not discoverable by the employé in the exercise of reasonable care, or the danger is of a character not appreciable by him because of inexperience, youth, or general incompetency or ignorance.

**Same.** Ordinarily the master has the right to assume the competency of an adult servant and that he appreciates the dangers incident to the work he undertakes.

**Same.** The duty to warn and instruct does not extend to the obvious dangers incident to a particular employment, that is those dangers which are discoverable by an exercise of that care which persons of ordinary intelligence are expected to use for their own safety.

**Same:** EVIDENCE. The evidence in an action for injuries to an employé caused by a premature explosion of powder while blasting is reviewed, and held insufficient to support a charge of negligence on part of the master, in failing to warn and instruct him in relation to the dangers incident to his employment.

*Appeal from Johnson District Court.*— HON. O. A. BYINGTON, Judge.

FRIDAY, FEBRUARY 14, 1908.

REHEARING DENIED, TUESDAY, SEPTEMBER 29, 1908.

ACTION at law to recover damages for a personal injury. Trial was had to a jury resulting in a verdict and judgment for plaintiff. The defendant appeals.— *Reversed.*

*Carroll Wright, J. L. Parrish,* and *A. E. Swisher,* for appellant.

*Dutcher & Davis* and *M. J. Wade,* for appellee.

Bishop, J.— The accident out of which grew the injuries of which plaintiff complains occurred in July, 1902, and the circumstances leading up to and immediately attendant upon the same were these:   The defendant was engaged in cutting through a natural surface elevation preparatory to laying a line of its railroad track.   To facilitate the removal of earth and rock, explosives (dynamite and powder) were used.   Incident to the work, holes two inches in diameter were drilled from the surface down to a depth of several feet, varying according to the elevation.   In such holes several sticks of dynamite were dropped, and each of these sticks were inclosed with common wrapping paper.   On the last stick to be dropped was placed an explosive cap, and thereto was attached a fuse some two feet in length.   As we understand it, the fuse is tubelike in appearance.   It consists of a cotton wrapper filled with some form of ignitable powder.   As the stick to which the cap and fuse were attached was about to be dropped into the hole the extreme end of the fuse was lighted with a match.   The burning of the fuse down to the cap would result in an explosion, involving, of course, all the sticks in the drill hole.   As the force of dynamite is exerted downward, the result of the explosion would be to break up the rock and loosen up the earth at the bottom of the drill hole, and this process was called " springing the hole."   Following this, the drill hole was filled with blasting powder, and this was exploded by means of a wire charged with electricity from a battery.   Plaintiff, a young man about twenty-two years of age, was in the employ of defendant as a dynamiter, or powderman, so called, and on the day of the accident had dropped dynamite into a drill hole and exploded it in the usual way.   Thereafter, and within a

few minutes, he proceeded to pour powder into the hole, and
this was followed immediately by an explosion, resulting in
the personal injuries of which complaint is now made.    The
action is bottomed on negligence.    Several grounds were al-
leged, but only one was submitted to the jury — that of the
alleged failure on the part of defendant to instruct and warm
plaintiff respecting the dangers incident to the work in which
he was employed.    At the close of the evidence for plaintiff,
the defendant moved for an instructed verdict on the grounds:
First, the evidence failed to show negligence on the part of
defendant; second, the evidence convicted plaintiff of con-
tributory negligence.    The motion was overruled.    After
verdict the like matters were again presented by a motion for
new trial, and such motion was overruled.    In these rulings
lies the error principally contended for.

Necessary, of course, to a determination of the questions
presented by the several motions, is the evidence.    Plain-
tiff, as a witness detailed the circumstances of his employ-
ment and of the accident, and we shall have the facts before
us in the light most favorable to him, by quoting from his
testimony, using his own language.    On direct examination
he testified:

I commenced working for the railway company in
April, 1901.   Before that worked as a day laborer.   Dur-
ing the summer I worked in the pit.   In September I worked
at drilling holes for about four days, and then again in the
pit until Christmas, after which I again helped in drilling
holes.   James Nesmith was giving directions to the men
during all that time.   I loaded rock and worked in the dirt
and used dynamite to break up frost.   Before that I had no
experience with powder or dynamite, but had seen holes
loaded with dynamite.   Later I went to another branch,
where we shot frost with dynamite.   In April, 1902, went
to Fairport, where I took the job of dynamiter.   Nesmith
came to me and wanted to know if I would be dynamiter, to
use the dynamite, and I told him I would if I could be
Sunday watchman.   He said I had better take it, and I
said I would if I didn't have to do any drilling, and could be

Sunday watchman. Up to that time I don't think I ever had experience in handling powder; had not had experience in springing holes with powder or dynamite; didn't know anything about the effect of dynamite as an explosive, or about the effect of powder, except what I saw there; did not know whether blasting with dynamite at the bottom of a hole would leave sparks. The ordinary practice was to spring the holes as quick as ready, and then they would be exploded as soon as the dirt was needed. To spring the holes several sticks were dropped in, after which a stick having a cap and fuse was dropped down on top of the others. I would light the fuse, drop the stick down in the hole, and then get away. The explosion would not show on the surface, except that some dust and dirt would come out at the top. At the bottom the effect would be to give it more cavity for the powder. Nesmith told me to use a fuse. We exploded the powder with a battery. At that time I did not know of the liability of sparks in the hole after the explosion. The dynamite sticks were wrapped with yellow wrapping paper, and were put down in the hole with the paper on them. Nesmith gave me directions in regard to the shooting. The powder and dynamite would not fill the hole to the top, but we would fill the hole clear up with rock and dirt. Nesmith never told me how long to wait between the time of springing the hole and pouring in the powder. I did not know of danger in pouring in powder within a short time after springing the hole. July 11th Nesmith started for Davenport. We had started drilling two holes, and he told Tom Nesmith to get those holes ready to shoot when he came back. The next morning I started at the first hole and drilled until the train came; then I took the drill out and started another hole. I went down to get some dynamite. That was about the time the train pulled in. I then went to the car to get the powder off the train. James Nesmith asked if I had the holes ready and I said: 'I just sprung them.' He said: 'Go ahead, and load them. We want to get something done. We are late.' I started to load the hole. I did not know that there was any sparks down in the hole at the time. Nesmith didn't tell me the work was dangerous, or ask me if I had had experience in this field of labor. He did not tell me anything about there being sparks from the paper around the dynamite. I think about five minutes elapsed between

the springing of the hole and the time I poured the powder in.

On cross-examination he testified:

After September, 1901, I was drilling holes for the purpose of loading them with dynamite and powder and exploding them. I used explosives at Fairport. I saw them use it there. I did not assist in exploding any of the holes, or see them light the fuse, or know why it was done. From that time until Christmas they used explosives, and as the work was carried on I was there as usual. I saw them drill and explode holes during that time. I knew how it was done. I knew that from observing how the other fellows did it. I saw them get ready to discharge the dynamite, and with the rest would get out of the way. After Christmas I went to work in the pit, and then Tom Nesmith helped me load some holes. Sometimes I would light a fuse, and sometimes he did. I knew when I lit the fuse it would burn and be followed by an explosion. When the fuse was lit, the fire was communicated to the wrapper outside. It was April or May when we came to Fairport and I took the position of powderman as the result of a conversation with James Nesmith. The reason I did not want to drill was that I had done enough of that. I had been drilling ever since I was on the job excepting what little work I did in the pit. After that I had charge of the drilling and exploding loads, and charge of the powder and dynamite up to the time of the accident; but it was under the supervision of James Nesmith. I had quite a number of men at work with me in connection with the drilling and loading holes off and on. Nesmith got the dynamite and powder somewhere, but it was unloaded in the pit, and I got it there. When I wanted powder and dynamite I went down after it myself, but sometimes one of my men had to get it. Sometimes we would spring a hole with dynamite twice before I loaded it with powder. I was in charge of the dynamite, and I examined the holes, and I would put in the charges and explode them. When I got ready to load the hole I went or sent down for the powder. I determined the question of how much powder should be put down, but not always. It depended on what Nesmith wanted. I did not wait every time to have him tell me about

it. Sometimes I did it as I thought it ought to be done, and went down and got as many cans as I thought necessary, using my own judgment. I do not remember of asking Nesmith about how many cans of powder to put in a hole more than once or twice. In springing the hole it would depend on how soon they wanted it about my loading it with powder. I cannot tell how much time would elapse between the springing of the hole and the loading of it. I sprung the holes as soon as they were drilled. I did that to get the work off my hands and have it in shape for loading. I did not know that the reason for springing the holes as soon as they were drilled was that there might be sufficient time elapse between the springing and the loading of them with powder to let any refuse matter left in the hole burn out and the hole cool off. I did not put the powder in right after springing the hole, because I did not think there was any need of it. I did not suppose there would be any fire in the hole after springing with dynamite. We did not put powder in right away every time, but did as soon as they were ready for the hole. I do not know whether it was ten minutes or half an hour. Outside of this one time I do not know whether we put powder in within half an hour after the hole was sprung. After May we would spring holes five or six times a week. I knew that fire would explode powder, but did not know that if there was fire down in the hole it would ignite powder. I did know that if I had a burning fuse made of cotton which came in contact with powder there would be an explosion, and I knew that the fuse burned slowly, and I knew that there was paper around dynamite and that it had the appearance of being oily. On the Fourth of July I took home some of the sticks of dynamite and some fuses and used them in my celebration.

On redirect examination, he testified:

About the blasting, Nesmith told me what to do. No one told me when to shoot the holes, but Nesmith gave me instructions about the blasting. I do not mean to be understood as having any men at work under me. I knew the fuse and the paper on the dynamite would burn, but did not know whether the fuse remained in the hole or was blown out by the dynamite. I don't know whether or not the dynamite would set fire to paper and cause an explosion.

On recross-examination he testified:

I have often celebrated on the Fourth of July, and have fired all kinds of firecrackers. I had observed that firecrackers after being exploded very frequently retained fire. Some of the firecrackers will burn after being exploded, and I have sometimes lit a new firecracker from the burning parts of the old ones. This was before the accident.

On redirect examination he testified:

I don't know what firecrackers are made of, or if there is any dynamite in them. Powder will set fire to anything that burns. I don't know whether dynamite will or not.

Stated generally, the duty of a master to warn and instruct his employés arises when the existence of danger is, or should be, in the exercise of reasonable care, known to him, and the existence of such danger is either unknown to them, or is not discoverable by them, in the exercise of reasonable care, or when the danger is such in character as not to be properly appreciated by them by reason of their lack of experience, their youth, or general incompetency, or ignorance. 4 Thompson on Negligence, section 4055.

1. MASTER AND SERVANT: duty to warn and instruct.

In taking an adult servant into his employ in a particular capacity, the master has the right, generally speaking, to presume competency on the part of such servant, and that he appreciates the dangers ordinarily incident to the work he undertakes to do. Of course, if the master knows, or has reason to believe, that the servant is ignorant, the duty to warn and instruct exists. *Yeager v. Railway,* 93 Iowa, 5; *McCarthy v. Mulgrew,* 107 Iowa, 76.

2. SAME

It has never been considered, however, that the duty to warn and instruct extends to those dangers incident to a particular employment which are obvious. And, having regard for the character of the employment, an obvious dan-

ger is one that is discoverable in the exercise of that rea-

sonable care which persons of ordinary intelli-

**3. SAME.** gence may be expected to take for their own safety. *Newbury v. Mfg. Co.,* 100 Iowa, 451; *Hanson v. Hammell,* 107 Iowa, 171.

With these rules — fundamental in the law of negligence — in mind, let us analyze the evidence on which the single charge of negligence is sought to be supported.   Plain-

**4. SAME: evidence.** tiff was an adult, and no question is made but that he was a young man of ordinary perceptive faculties and intelligence.   He had been in the service of the defendant in and about the work of blasting and removing earth and rock for a year before he took the job of dynamiter or powderman.   During that year he had drilled the preliminary holes, and had observed the work of blasting as it was being carried on.   On numerous occasions he had assisted in the work, and says that he knew how it was done.   During the three or four months that he acted as powderman he was in charge of the work, under Nesmith, he says; but it seems that the oversight did not extend beyond giving instructions as to the time and place of blasting.   There was but one way to do the work.   It was simple, and plaintiff says that he acted on his own initiative in doing it.   He knew what material the sticks of dynamite were covered with, and of what a fuse was composed, and that such were inflammable.   He knew that he was introducing fire into the drill hole when he dropped a lighted fuse therein, and he knew that fire was likely to cling to a shattered fuse for some length of time following the process of springing the hole.   He knew that powder when brought into contact with fire would explode.   Indeed had Nesmith on the morning of the accident assumed to warn plaintiff of the possibility of particles of smouldering fire remaining in a hole recently sprung, and of the danger of pouring powder into such hole before the lapse of sufficient time to make sure that the fire had died out, it would be incredible that he

should be met with any other statement than that " I know that as well as you do."

Moreover, plaintiff ought not to be heard to say that he did not know. He had undertaken the work voluntarily. Confessedly he knew that he was dealing with dangerous materials, and that a proper handling thereof was absolutely essential to safety. It became his duty, therefore, to familiarize himself with all the dangers incident to the work. And, without doubt, this must be held to include knowledge respecting the length of time which, in the interests of safety, should be allowed to intervene between the operation of springing a hole and the insertion of a powder charge. And we think it must be said that he did know all that any one could have known. Of course, no one could fix in advance and with exactness the length of time necessary; but, knowing the nature and character of the substance being dealt with, it would seem that common sense alone would indicate that safety required more than a few minutes of time. It is not material that Nesmith did not on the particular occasion in question warn plaintiff of the danger in loading the hole with powder within a few minutes after such hole had been sprung. It is to be borne in mind that the conduct of Nesmith on the occasion is not before us for consideration as an act of negligence. Whatever bearing it has is on the question of the right of plaintiff to be warned and instructed. Now if plaintiff knew, or ought to have known, of the danger incident to charging a hole with powder within a few minutes after springing the hole, he was not entitled of right to a warning. " The master is under no duty of warning of instructing a servant as to dangers which are discoverable by the exercise of ordinary care on his part, with such knowledge, experience, and judgment as he actually possesses, or as the master is justified in believing that he possesses." 4 Thompson on Negligence, section 4063.

We conclude that a case of negligence on the part of defendant is not made out by the record; and, not only this,

but that plaintiff has failed to show that he acted in the premises with the degree of care that under all the circumstances was demanded of him. It follows that the judgment must be reversed, and a new trial ordered.— *Reversed.*